Estate of Paul Leroy Mitchell, Deceased, Bettie Ann Mitchell, Executrix, and Bettie Ann Mitchell v. Commissioner.
Estate of Mitchell v. Commissioner
Docket No. 75033.
United States Tax Court
T.C. Memo 1959-246; 1959 Tax Ct. Memo LEXIS 5; 18 T.C.M. (CCH) 1168; T.C.M. (RIA) 59246; December 31, 1959
*5 Hiroshi Sakai, Esq., and James H. Kamo, Esq., for the petitioners. Charles W. Nyquist, Esq., for the respondent. KERN mined income tax deficiencies against the petitioners for the calendar years 1953 and 1955 in the respective amounts of $22,524.80 and $461.95. While the prayer in the amended petition asks that this Court find "that the petitioners owe no additional taxes for the years 1953 and 1955," there is no allegation of error with regard to the latter year and no reference was made to that year at the trial or on brief. Accordingly, we conclude that only the deficiency for the year 1953 requires our consideration. That deficiency arises by reason of respondent's determination that "the payment of $69,000.00 received by Paul L. Mitchell under, and upon termination of, an employment contract, from Western Family, Inc. in 1953 is taxable in full as ordinary income." It is petitioners' contention that this sum constituted capital gain. Findings of Fact The stipulated facts, including the exhibits attached thereto, are incorporated herein by this reference. Paul Leroy Mitchell, deceased, and his wife, Bettie Ann Mitchell, filed joint Federal income tax returns *6 for the calendar years 1953 and 1955 with the district director of internal revenue at Honolulu, Hawaii. The decedent was a resident of Honolulu at the date of his death on October 20, 1957, and his widow, Betti Ann Mitchell, continues to reside there. She was duly appointed executrix of the decedent's estate on January 7, 1958. For many years prior to 1952 the decedent and his father-in-law, Edgar A. Seymour, owned and operated a publishing business in Los Angeles, California. The principal activity of the business was the publication of a magazine called "Western Family," which contained articles, recipes, and advertisements of interest to homemakers. The magazine was sold to Pacific Mercantile Company, a cooperative holding company, which in turn distributed it to the public through member retail grocery stores and super markets in 11 western states and Hawaii. From August 1950 until December 1951 the business (hereinafter sometimes referred to as Western Family) was conducted as a partnership in which the decedent and Seymour each owned a one-half interest. Western Family's net income for 1951, prior to any salaries or distributions to the partners, was $25,931.92, and its *7 net worth at the close of that year was $16,554.94. The nature of the business was such that skillful and imaginative management was of great importance to its success. The decedent was always very active in the management of that business. He felt, however, that his partner Seymour was lacking in sound business judgment, and found it difficult to get along with him. In 1951 the decedent decided to withdraw from the business, and on December 17 of that year he entered into a contract with Charles A. Glass, who agreed to purchase his interest in Western Family for $25,000 cash, provided the business was first incorporated. It was further agreed that in the event Glass sold the interest he was acquiring to Pacific Mercantile Company before January 1, 1957, he would pay the decedent 10 per cent of any amount he received on such sale in excess of $25,000. Pursuant to this agreement, a corporation, Western Family, Inc., was organized on December 18, 1951, with authorized common stock of 500 shares, and on December 31, 1951, the operating assets of the partnership were transferred to the corporation in exchange for 200 shares of its stock. One hundred of these shares were issued to *8 Seymour; however, the 100 shares representing the decedent's interest were issued directly to Glass in accordance with the December 17 contract of sale. In the sale of his interest in Western Family to Glass, the decedent was represented by counsel who assisted in the preparation of the necessary documents. On their original joint income tax return for 1951, which was filed with the then collector of internal revenue for the sixth district of California, the decedent and his wife reported the sale of 100 shares of stock in Western Family, Inc., as resulting in a long-term capital gain computed as follows: Gross Sales Price
$25,000.00
Less: Cost
$8,277.47
Selling Expense
500.00
8,777.47
Net Long-term Capital Gain
$16,222.53
On or about January 2, 1952, the decedent entered into a contract of employment with Western Family, Inc., under which he was retained "in a consulting and advisory capacity" for a period of 5 years commencing January 1, 1952, at a salary of $500 a month plus 1 per cent of the "net advertising revenue" of the corporation to the extent that such percentage exceeded the amounts paid monthly as salary. In addition the corporation *9 agreed to advance the decedent on September 1, 1952, in lieu of a retainer, the sum of $6,000 as a loan, without interest, to be repaid only out of the last $6,000 due him under the contract. In return, the decedent obligated himself not to compete and agreed to render a wide variey of advisory services to the corporation at its request. The contract further provided that the compensation payments due the decedent thereunder would cease upon his death. Under the contract the corporation could terminate the decedent's employment at any time after a total of $75,000 had been paid him and it could terminate his employment in the event the business or a controlling interest therein were sold by paying him the difference between $75,000 and what he had already received. If the contract was not terminated, the corporation could extend the term of his employment for an additional 3 years at a revised rate of compensation. On the same date, January 2, 1952, the decedent and Glass made a separate agreement which provided that in the event Glass should sell his interest in Western Family, Inc., before January 1, 1957, and before termination of the employment contract, to persons other than *10 members of his own family he would, at the decedent's option, cause the purchasers thereof either to assume liability for the completion of the employment contract or to terminate the contract and pay the decedent the difference between $75,000 and the amounts theretofore paid him by the corporation. After the sale of his interest, the decedent and his wife continued to live near Los Angeles, California, until July 4, 1952, when they sailed in a private yacht to Hawaii and then to Tahiti. They returned to Hawaii in May 1953 and established a residence in Honolulu. While still in California, the decedent reviewed the January 1952 issue of "Western Family," and wrote a letter to Glass suggesting improvements in the layout. In addition, he conferred with the management of the corporation on several occasions, and between January and July of 1952 he traveled over 8,500 miles in its behalf. During his stay in Tahiti the decedent received a number of issues of the magazine by mail and wrote Glass about them. Aside from these services the decedent neither performed nor was requested to perform any other work for the corporation. In 1952 Western Family, Inc., paid the decedent $6,000 *11 in salary and withheld tax of $868. On or about September 1, 1952, the corporation, pursuant to the terms of the employment contract, advanced the decedent an additional $6,000 as a loan and withheld no tax thereon. On their original joint income tax return for 1952 the decedent and his wife reported as ordinary income the $6,000 in salary payments, and deducted therefrom $532 in travel expenses. They did not report the additional $6,000 which the corporation loaned the decedent in September 1952. Upon his return to Hawaii the decedent learned that Glass on April 23, 1953, had sold his stock in Western Family, Inc., to Seymour for $70,000. Acting upon the advice of his attorney, the decedent on October 9, 1953, wrote a letter to Glass in which he set out the substance of their agreement of January 2, 1952, and advised Glass that, pursuant to that agreement, he was exercising his option to have the employment contract with Western Family, Inc., terminated and receive in a lump sum the difference between $75,000 and amounts already paid him. On October 20, 1953, the decedent addressed a letter to both Glass and the corporation. This letter released Glass from any further obligation *12 to the decedent under their agreement of January 2, 1952, and, in pertinent part, stated as follows: "This will acknowledge the receipt from Western Family, Inc., of the entire balance due me under my employment contract of January 2, 1952, with Western Family, Inc., * * *" Thereafter, the decedent's attorney advised him that the $75,000 received from Western Family, Inc., under the employment contract and the $25,000 received from Glass constituted the proceeds of a single transaction whereby the decedent had sold his interest in the business for $100,000, all of which should have been reported as consideration for the installment sale of a capital asset. Accordingly, on January 13, 1954, the decedent and his wife filed amended joint returns for 1951 and 1952, and on March 15, 1954, they filed their original return for 1953. Opinion KERN, Judge: According to the contracts and correspondence set out in our findings, the receipts of the decedent in 1953 pursuant thereto constituted compensation, or a payment in lieu thereof, taxable as ordinary income, and the respondent has so determined. The burden of proving that these receipts in reality represented payment for the stock *13 sold by decedent in 1951 and therefore were taxable as capital gains is on petitioners. After a careful review of the record herein and the thorough briefs filed by petitioners' counsel, we are of the opinion that petitioners have not successfully borne this burden. Accordingly, Decision will be entered for the respondent.